2261

FIRST UNION MORTGAGE CORPORATION, Appellant-Respondent
v. Jacob E. THOMAS, Respondent-Appellant.

(451 S.E. (2d) 907)

Court of Appeals

*Samuel H. Altman* and *Jonathon S. Altman,* both of *Alt-*

*man & Sturgis*, and *Thomas E. Lydon*, of *Nelson, Mullins, Riley & Scarborough*, Charleston, for *appellant-respondent*.

*Thomas J. Wills, IV*, of *Barnwell, Whaley, Patterson & Helms*, Charleston, for *respondent-appellant*.

Heard Oct. 4, 1994.

Decided Nov. 28, 1994; Reh. Den. Jan. 19, 1995.

HOWELL, Chief Judge:

First Union Mortgage Corporation (First Union) brought this action against Jacob E. Thomas seeking to recover $58,500 due as an origination fee for First Union's services in obtaining a loan commitment from a proposed lender. Thomas filed various counterclaims. The jury found in favor of Thomas on First Union's claim, and awarded almost $600,000 in actual and punitive damages against First Union on Thomas' counterclaims. First Union appeals the denial of its motions for JNOV, new trial and new trial nisi remittitur. Thomas appeals the trial court's dismissal of an additional counterclaim against First Union for unfair trade practices. We affirm in part, reverse in part, and remand.

### I.
Thomas is a commercial real estate developer engaged in the business of developing shopping centers. Thomas had obtained the majority of his financing through First Federal of Charleston, including the financing for the Galleria, a shopping center located in Summerville. After new federal regulations established certain lending caps, Thomas sought to reduce the amount of debt he owed to First Federal by refinancing the Galleria.

According to Thomas, John Darby of First Union approached him about refinancing the Galleria. First Union was to act as a mortgage broker to obtain a commitment from another lender for permanent financing of the Galleria. At Darby's request, Thomas provided First Union with financial information, rent rolls, and leases of the Galleria tenants so Darby could seek proposed lenders for a seven million dollar loan. On February 6, 1990, Thomas executed a Mortgage Loan Application and Exclusive Agreement (the Exclusive Agreement) whereby Thomas agreed to pay First Union an origina-

tion fee for services in arranging financing. The Exclusive Agreement provided that the fee was earned when Thomas accepted a commitment for financing. The Agreement was sent to Thomas under a cover letter from First Union, dated February 2, 1990 and signed by Darby, indicating Southern Farm Bureau (Southern Farm) was interested in financing the Galleria in the amount of $6,000,000. The letter also indicated "Southern Farm is a (sic) old correspondent of First Union and one of our top mortgage investors for loans ranging from $1,000,000 to $7,000,000." Darby later admitted, however, that the largest loan arranged through Southern Farm had been $4.5 million, and that their average loan was $2.5 million. Thomas testified he would not have entered into the agreement had he known this information.

On February 23, 1990, Thomas executed a Southern Farm Mortgage Loan Application, which was forwarded to Southern Farm along with financial statements, surveys, leases, and other required information. After reviewing the information submitted by Thomas, Southern Farm became concerned about certain provisions in the lease with Bi-Lo, Inc., the Galleri's anchor tenant. The Bi-Lo lease contained a restrictive covenant which prohibited within the Galleria the operation of a lounge, tavern, or health spa.[1] In spite of this provision, the Galleri's tenants included a sports bar and a fitness center. By letter dated March 14, 1990, Darby notified Thomas that Southern Farm would require, among other things, written approval from Bi-Lo allowing the sports bar and fitness center on the premises. After Thomas received the letter, Darby spoke to him by phone and told Thomas that the loan would not close if Bi-Lo did not consent to the sports bar and fitness center. Thomas assured Darby that he would correct the problem.

Thereafter, Southern Farm issued a loan commitment for $5.85 million, contingent upon compliance with certain terms and conditions, including review and approval of all loan documents and leases, and estoppel letters from all the tenants of

---

[1] Specifically, the lease provided "Lessor further covenants and agrees that no store(s) and/or building(s), or any part of the same, now or hereafter acquired and/or constructed by Lessor within the Center or upon any property adjoining the Center in which Lessor has ownership interest, directly or indirectly, and either legal or equitable, or a possessory right or interest, shall be used for the operation of a lounge, tavern, nightclub, health spa, skating rink, theatre, arcade or amusement center."

the Galleria. Thomas accepted the commitment on April 13, 1990. The commitment provided it would expire, and Southern Farm's obligations to Thomas would terminate, unless the loan closed before August 3, 1990. The commitment further provided that all required documentation must be submitted to Southern Farm at least thirty days before the closing of the loan.

Southern Farm's Mortgage Loan Application form required Thomas to submit a two percent deposit as consideration for the issuance of the loan commitment. According to Thomas, when he told Darby he could not afford to pay First Union's origination fee and deposit up front, Darby told him to send First Union the $60,000 origination fee[2] which First Union would send to Southern Farm to cover part of the deposit, and Thomas would then pay the balance of the deposit directly to Southern Farm. Thomas also testified Darby agreed First Union would receive its original fee at closing. Darby testified that, as a courtesy to Thomas, First Union agreed to forward to Southern Farm its origination fee (which Thomas paid when he signed the Exclusive Agreement with First Union), so that Thomas would only be required to send Southern Farm the remaining one percent. First Union agreed to wait until closing for Thomas to repay the origination fee.

Although Southern Farm's commitment was to expire on August 3, 1990, and required submission of all documents thirty days in advance, Thomas had not satisfied all the conditions of the commitment by the middle of July. Importantly, Thomas had not yet obtained Bi-Lo's consent to the violations of the restrictive covenant in its lease. At Thomas' request, Southern Farm extended the expiration of its commitment until August 24, 1990. In addition to the problem with the Bi-Lo lease, Southern Farm in mid-August discovered a problem regarding the use of the Galleri's parking facilities by an out-parcel tenant. By August 24, 1990, Thomas still had not satisfied all Southern Farms requirements, and had not obtained Bi-Lo's consent to the violations of its lease. On August 23, 1990, Bi-Lo sent Thomas' attorney a letter in which Bi-Lo refused to waive the restrictive covenant in its lease. Although Bi-Lo consented to the specific tenants under the current

---

[2] The origination fee was later reduced to $58,500 when the loan was reduced to $4.85 million.

leases, Bi-Lo refused to extend its consent to future tenants or to sublessees or assignees of the current tenants. This consent was received by Thomas after the expiration of the commitment, and because of its limited scope, Bi-Lo's consent was not satisfactory to Southern Farm. The parking problem likewise was not resolved.

Southern Farm's loan commitment expired August 24, 1990, and by letter to Thomas dated August 28, 1990, Southern Farm refused to extend it further. Thomas and Southern Farm then entered into a release and indemnity agreement (the Release Agreement) in which Southern Farm agreed to return to Thomas $107,868.80, representing the deposit, less fees and costs, and Thomas agreed to waive any claims he might have against Southern Farm. Thereafter, First Union requested Thomas pay its origination fee, and Thomas refused. In January 1991, First Union caused to be issued a warrant of attachment on the $107,868.80 check being forwarded from Southern Farm, to secure Thomas' obligation for the origination fee. For two days, a uniformed sheriff's deputy awaited the check in Thomas' place of business, and attached the check upon its arrival.

First Union then brought this action alleging breach of contract and seeking recovery of the $58,500 fee, plus interest and attorney's fees. Thomas counterclaimed against First Union for breach of contract, tortious interference with contractual relations, abuse of process and unfair trade practices. The trial court directed a verdict against Thomas' unfair trade practices claim.

The jury returned a verdict in favor of Thomas on First Union's action, and returned a verdict against First Union for $380,000 actual damages for breach of contract, $25,000 actual and $60,000 punitive damages for abuse of process, and $132,730 actual damages for tortious interference with contractual relations. The trial court denied First Union's motions for judgment notwithstanding the verdict, new trial, and new trial nisi remittitur.

## II.

On appeal, First Union argues the trial court erred in denying its directed verdict motion on its breach of contract action, because First Union was entitled to its

origination fee once Thomas accepted the commitment offered by Southern Farm. We agree.

The Exclusive Agreement provided the origination fee "shall be earned where a commitment is issued substantially under the terms shown in this application, i.e., amount, rate, term, amortization, prepayment, and guarantee; or when a commitment issued on other terms is accepted by applicant." On April 13, 1990, Thomas accepted the Southern Farm commitment to provide financing for the Galleria. Thus, by the clear language of the Exclusive Agreement, First Union earned its fee on April 13, 1990. Thomas breached the Agreement by refusing to pay the fee earned by First Union.

Thomas contends the parties agreed the fee was to be earned at closing. We disagree. The Exclusive Agreement clearly and unambiguously provided that First Union's fee was earned when Thomas accepted a commitment for financing. There is no evidence in the record which shows this portion of the agreement was ever modified by the parties. While First Union did agree to wait until closing to *collect* its fee, there was no evidence the contract was modified so that the fee would be *contingent* on the loan actually closing. Thomas himself testified only that First Union agreed to wait until closing to collect its fee; he did not testify that the parties agreed the fee would not be earned unless the loan closed. However, even if Thomas did believe the Exclusive Agreement was so modified, the only evidence in the record is that Darby never had the same understanding. Darby specifically testified that the Exclusive Agreement was never amended to provide that the fee was contingent upon closing, and Darby sent Thomas a letter in July 1990 requesting payment of the fee. While a written contract can be orally modified, there must be a meeting of the minds as to the modification. *Player v. Chandler*, 299 S.C. 101, 105, 382 S.E. (2d) 891, 893-94 (1989) (any modification of a written contract must satisfy all the requisites of a valid contract, including a meeting of the minds). Because there is no evidence the parties agreed to modify the Exclusive Agreement, First Union as a matter of law was entitled to a directed verdict on its breach of contract claim.

Thomas also argues First Union is not entitled to recover for breach of contract because First Union fraudulently induced him to sign the Exclusive Agreement.

According to Thomas, First Union fraudulently misrepresented Southern Farm's lending strength when Darby stated that Southern Farm was one of First Union's top lenders for loans ranging from $1,000,000 to $7,000,000, even though Darby knew that the average amount of Southern Farm's loans was $2,500,000. Thomas contends he never would have accepted the Southern Farm commitment had he known Southern Farm had never made a loan for $7,000,000. The conduct complained of by Thomas, however, does not amount to fraud as a matter of law. A claim or defense of fraudulent misrepresentation requires establishing the following elements: (1) a representation; (2) the falsity of the representation; (3) the materiality of the representation; (4) knowledge of its falsity, or reckless disregard for its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of the falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *Ardis v. Cox,* — S.C. —, —, 431 S.E. (2d) 267, 269 (Ct. App. 1992), *cert. denied* (1994). We need not comment on each element, because Thomas presented no evidence that Darby intended the statement to induce Thomas to sign the commitment letter. Without evidence of intent, Thomas' misrepresentation claim must fall. *Ardis,* — S.C. at —, 431 S.E. (2d) at 269 (failure to establish any one of the elements is fatal to a fraud claim).

Likewise, we find no evidence in the record to support Thomas' contention that First Union did not perform its obligations under the Exclusive Agreement. Under the Exclusive Agreement, First Union was obligated to provide "services in arranging" for the requested loan. There can be no doubt that First Union provided these services, given that a commitment was in fact obtained by First Union and accepted by Thomas. First Union continued to provide services to Thomas after the commitment was accepted, acting as intermediary between Thomas and Southern Farm, and arranging secondary financing for the Galleria. In addition, the evidence clearly established Fist Union continued to work on the transaction even after Southern Farm's commitment expired. Thomas' claim that First Union did not perform its contractual obligations is therefore not supported by the record.

In reviewing the denial of a directed verdict motion, the evidence must be considered in the light most favorable to the nonmoving party. *Pinckney v. Winn-Dixie Stores, Inc.,* — S.C. —, 426 S.E. (2d) 327 (Ct. App. 1992), *cert. denied* (1993). In an action at law tried to a jury, the jurisdiction of this Court extends only to the corrections of errors at law. *Id.; Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E. (2d) 773 (1976). Giving Thomas the benefit of every reasonable inference, the evidence establishes that, pursuant to the terms of the Exclusive Agreement, First Union earned its fee on April 13, 1990, when Thomas accepted the Southern Farm commitment. There is no evidence the parties agreed to modify the Exclusive Agreement to provide that the fee was contingent on closing, and Thomas failed to present evidence establishing a defense to enforcement of the contract. First Union was therefore entitled to a directed verdict on its breach of contract claim against Thomas. Moreover, because First Union performed its obligations under the Exclusive Agreement, First Union was also entitled to a directed verdict on Thomas' breach of contract claim. Accordingly, because there is no evidence supporting the jury's verdicts on First Union's breach of contract claim and Thomas' breach of contract claim, we reverse those verdicts. First Union fully performed its obligations under the Exclusive Agreement and therefore is entitled to its origination fee. Because First Union did not breach the Exclusive Agreement, Thomas is not entitled to the damages awarded on his breach of contract claim.[3]

### III.

First Union next challenges the jury's verdict on Thomas' claim of tortious interference with contractual relations. We find that there was no evidence showing a breach of the underlying contract and therefore reverse.

A cause of action for tortious interference with contractual relations requires: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3)

---

[3] Because we find that there is no evidence supporting Thomas' contention that First Union breached its obligations under the Exclusive Agreement, we need not address First Union's argument that the damages sought by Thomas on the breach of contract claim were unrecoverable lost profits from a new business.

intentional procurement of its breach; (4) absence of justification; and (5) damages. *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 287 S.C. 190, 336 S.E. (2d) 472 (1985). Thus, without a breach of the underlying contract, there can be no recovery. Thomas contends the evidence presented at trial supports the jury verdict that First Union tortiously interfered with the Release Agreement between Southern Farm. Thomas argues that by attaching the Southern Farm check, First Union prevented Thomas from receiving the benefit of his bargain with Southern Farm, thus supporting his tortious interference claim. The agreement between Thomas and Southern Farm required Southern Farm to return $107,868.80 to Thomas, which Southern Farm did. Southern Farm fully performed its obligations under the Release Agreement by mailing the check to Thomas, which Thomas received. While First Union's actions may have interfered with Thomas' access to the funds, this interference does not amount to procurement of a breach of contract, because Southern Farm did not breach the Release Agreement. Without a breach of the underlying contract, First Union cannot be held liable for intentional interference with contractual relations.[4]

## IV.

First Union also contends it was entitled to a directed verdict on the abuse of process claim because there was no evidence of any ulterior or improper purpose in the attachment of the Southern Bureau check. We agree.

The essential elements of an abuse of process claim are (1) an ulterior purpose; and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. *Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E. (2d) 39 (Ct. App. 1984); *Huggins v. Winn-Dixie Greenville, Inc.*, 249 S.C. 206, 153 S.E. (2d) 693 (1967). Thomas argues First Union's attachment of the Southern Farm check constitutes an abuse of process because First Union did not need the check as security for any judgment rendered against Thomas, because he owns other property in South Carolina. Thomas further con-

[4] Thomas' contention that the Release Agreement was never consummated is without merit. While it was immediately seized by the sheriff, Thomas did in fact receive the check. Southern Farm performed its obligations, and the Release Agreement was therefore consummated.

tends First Union attached the check with the ulterior purpose of "coercing Thomas to concede his rights to a disputed claim."

Attachment is a statutory remedy available only under the circumstances provided for in the statute. The statute specifically allows attachment in an action for the recovery of money against a nonresident defendant. S.C. Code Ann. § 15-19-10 (1976). First Union had a claim against Thomas for the recovery of money (the origination fee), and Thomas admitted that he is not a resident of South Carolina. First Union was therefore entitled to attach property of Thomas to provide security for its claim, and the check was property subject to attachment. *See* S.C. Code Ann. § 15-19-220 (1976) (all property of defendant in the state is subject to attachment except property constitutionally exempt from attachment); *see also Charles R. Allen, Inc. v. Island Co-op. Servs. Co-op. Ass'n, Ltd.*, 234 S.C. 537, 109 S.E. (2d) 446 (1959) (foreign corporation's interest in the proceeds of a draft is subject to attachment); *McKelvay v. South Carolina R.R. Co.*, 6 S.C. 446 (1875) (debt owed to defendant by third party is subject to attachment). Thomas apparently concedes that First Union was entitled to attach Thomas' property generally,[5] but argues that it should have attached something other than the check. Under the attachment statute, all non-exempt property of the defendant in the state may be attached, and there is no requirement that the property attached have any connection to the dispute. First Union attached the Southern Farm check in accordance with the requirements of the attachment statute; the fact that Thomas had other property in the state through which First Union could have satisfied a judgment does not render First Union's attachment improper.

An abuse of process claim generally focuses on the improper use of process after it has been issued. *Scott v. McCain*, 275 S.C. 599, 274 S.E. (2d) 299 (1981). An ulterior purpose exists if the process is used to gain an objective not legitimate in the use of the process. However, there is no liability when the process has been carried to its authorized

---

[5] In his brief Thomas states "First Union did not need to acquire security rights in the $107,000 check when an abundance of assets were available to attach."

conclusion, even though with bad intentions. *Rycroft*, 281 S.C. at 125, 314 S.E. (2d) at 44. Here, First Union used the attachment process only as a means to recover money to which it was entitled. There was no attempt by First Union to gain an objective otherwise unattainable or to coerce Thomas into paying money to which First Union was not entitled. First Union utilized the attachment process as it was intended—to commence an action for the recovery of money against a nonresident defendant and to provide security for any eventual judgment. That Thomas disputed the debt does not transform First Union's conventional and proper use of civil process into an abuse of that process. *Bell Lines, Inc. v. Strickland*, 254 S.C. 148, 173 S.E. (2d) 788 (1970) (no abuse of process claim lies for conventional use of civil process to collect a debt). Because First Union simply carried the attachment process to its authorized conclusion, its actions as a matter of law do not constitute abuse of process. *See Rycroft*, 281 S.C. at 125, 314 S.E. (2d) at 44.[6]

## V.

Thomas also appeals, arguing the trial court improperly granted First Union's directed verdict motion against Thomas' claim under the Unfair Trade Practices Act (UTPA). We disagree.

---

[6] Thomas takes issue with the affidavit executed by First Union to procure the warrant of attachment. The affidavit stated First Union "has reason to believe the [proceeds of the Southern Farm check] may be removed from the State." Thomas apparently contends that because First Union knew Thomas had other property in the state, First Union could not have believed the proceeds might be removed from the state. We fail to see how First Union's knowledge of Thomas' assets has any bearing on the truth of the statements in the affidavit. It seems quite reasonable to believe that a nonresident will take money out of state, whether or not he owns other property in the state. Moreover, even if First Union did not believe the statement to be true, it is irrelevant to Thomas' abuse of process claim. Whether or not the proceeds of the check were to be taken out of state, First Union was entitled to attach the check (or other property in the state belonging to Thomas) because it had a claim for money against Thomas, a nonresident. Notwithstanding the statements in the affidavit, First Union used the attachment process exactly as it was intended to be used, and only in pursuance of a fee to which it was entitled. Thomas' vague challenge to the affidavit does not create an ulterior motive or improper use of the attachment process on the part of First Union. Without an improper motive, there can be no abuse of process.

The trial court determined the evidence established only a private wrong, which did not reach the level of public interest so as to bring it within the purview of the UTPA. To be actionable, alleged unfair or deceptive acts or practices must adversely affect the public interest. *Noack Enters., Inc. v. Country Corner Interiors of Hilton Head Island, Inc.*, 290 S.C. 475, 351 S.E. (2d) 347 (Ct. App. 1986). In his counterclaim, Thomas alleges "First Union [failed] to properly perform services under its Agreement to arrange financing and arbitrarily [required] payment under the Agreement when no closing had taken place." At best, Thomas alleged and proved unfair or deceptive acts or practices affecting the parties to the transaction. However, Thomas did not allege any facts or present any specific evidence demonstrating an adverse affect on the public interest. *See Daisy Outdoor Advertising Co. v. Abbott*, — S.C. —, 451 S.E. (2d) 394 (C. Ct. App. 1994) (adverse impact on public interest must be proved by specific facts). The UTPA is not available to redress a private wrong where the public interest is unaffected. *Key Co., Inc. v. Fameco Distribs., Inc.*, 292 S.C. 524, 357 S.E. (2d) 476 (Ct. App. 1987). Accordingly, the trial court properly directed a verdict against Thomas' UTPA claim.

## VI.

In summary, we reverse the jury's verdict against First Union on its breach of contract claim against Thomas and the verdict in favor of Thomas on his breach of contract claim. We also reverse the verdicts in favor of Thomas on his claims of tortious interference with contractual relations and abuse of process.[7] Finally, we affirm the directed verdict against Thomas' claim under the Unfair Trade Practices Act. Accordingly, the appealed order is affirmed in part, reversed in part, and remanded with instructions that judgment be entered in accordance with this decision.

SHAW and CURETON, JJ., concur.