707 S.E.2d 431

ESA SERVICES, LLC (formerly ESA Services,
Inc.) c/o Extended Stay, Inc., Respondent,

v.

SOUTH CAROLINA DEPARTMENT OF REVENUE, Appellant.

No. 4778.

Court of Appeals of South Carolina.

Heard Oct. 6, 2010.
Decided Jan. 19, 2011.

Carol I. McMahan, Thomas A. McDermott, Ronald W. Urban, and Andrew L. Richardson, Jr., all of Columbia, for Appellant.

David B. Summer, Jr., and Faye A. Flowers, both of Columbia, for Respondent.

WILLIAMS, J.

On appeal from the administrative law court (ALC), the Department of Revenue (the Department) argues ESA Services, LLC (ESA) is not entitled to claim certain Job Development Credits (JDCs) pursuant to the South Carolina Enterprise Zone Act of 1995 [1] (the Act) because ESA failed to meet specific obligations as required by the Revitalization Agreement (the Agreement) executed between ESA and the Advisory Coordinating Council for Economic Development (Council). We affirm.

## STATUTORY BACKGROUND

In 1995, the Legislature passed the Act to provide tax incentives for businesses seeking to locate or expand to "rural, less developed counties" in South Carolina. *See* S.C.Code Ann. § 12–10–20 (2000 & Supp.2009). To qualify for tax incentives under the Act, businesses were required to meet the eligibility requirements established by section 12–10–50(A)(1)–(4) of the South Carolina Code (Supp.2009). Particularly, section 12–10–50(A)(3) required businesses to enter into a revitalization agreement with Council. The Act gave Council absolute discretion in deciding whether to enter into a revitalization agreement. S.C.Code Ann. § 12–10–60(A) (Supp.2009). Although the terms of each individual agreement differed, every revitalization agreement uniformly required each business to create a minimum number of jobs and to make a minimum capital investment by a certain date to claim JDCs. § 12–10–50(A)(3); S.C.Code Ann. § 12–10–80(A) (Supp.2009). Pursuant to the Act, once a business met the minimum job requirement and minimum capital investment set forth in the revitalization agreement, the business was eligible to claim JDCs. § 12–10–80(A).

## FACTS

ESA is a limited liability company authorized to do business in South Carolina.[2] At some point prior to 2001, ESA began

---

1. S.C.Code Ann. §§ 12–10–10 to –110 (2000 & Supp.2009).

2. During the time period that ESA sought JDCs, it was doing business as ESA Services, Inc. and was a member of a group of publicly traded

negotiations with the State of South Carolina in an attempt to relocate its national corporate headquarters from Fort Lauderdale, Florida, to Spartanburg, South Carolina, as well as to expand its South Carolina operations. In furtherance of these negotiations, ESA submitted an application to Council[3] on July 19, 2001, seeking approval to participate in the South Carolina Enterprise Zone Program. In its application, ESA stated it intended to build a $13 million corporate headquarters facility as well as to create an estimated two hundred new jobs in South Carolina.

One week after receiving ESA's application, Council sent a letter to Bill Kastler, an accountant with Pricewaterhouse Coopers in Spartanburg, who assisted ESA in the application process. In the letter, Council stated that it approved ESA's application "with the contingency that only positions paying above $11.58 an hour would qualify for Job Development Credits." The letter further stated that Council intended to enter into a final agreement with ESA within eighteen months of the date of the original application, and ESA could accept the terms, as outlined in the letter, by signing and returning a copy of the letter to Council. Despite Council's contention that it sent this letter to ESA, no evidence was presented that ESA received the letter, and the Department never established that an executed copy of the letter was signed and returned to Council.[4]

---

companies that owned and/or operated extended stay lodging facilities. Its parent company was Extended Stay America, Inc., and ESA was a wholly-owned subsidiary. In May 2004, ESA was purchased by the Blackstone Group and became a private company, and while ESA changed its name and income tax status, this had no effect on its operations or ability to qualify for JDCs. ESA subsequently merged into HVM, LLC, a sister company owned by the Blackstone Group, and the resulting corporation, HVM, LLC withdrew any future claims for JDCs under the Agreement. Apart from the three pending claims for refunds in this appeal, no further claims for JDCs can be made by ESA.

3. Pursuant to section 1–30–25 of the South Carolina Code (Supp.2009), Council is statutorily incorporated in and administered as part of the Department of Commerce.

4. The letter was addressed to Bill Kastler, whose office is in Spartanburg, South Carolina, but it was actually mailed to ESA's headquarters in Fort Lauderdale, Florida.

Subsequently, on August 15, 2002, ESA notified Council that it would increase its capital investment from $13 million to $14.49 million and could commit to the creation of two hundred fifteen as opposed to two hundred new jobs. Council agreed to this increase by letter dated August 29, 2002, which also discussed wages and JDCs, but did not mention the $11.58 minimum wage contingency. During the final negotiations between ESA and Council, ESA relocated to Spartanburg, South Carolina. Each party executed their respective portion of the Agreement, and Council returned the fully executed Agreement to ESA on July 16, 2003, with an effective date of July 19, 2001. Council attached a cover letter to the Agreement, in which Council stated that ESA could begin claiming JDCs after it had certified to Council, in writing, that it had created the minimum two hundred fifteen full-time jobs and had met the minimum $14.49 million capital investment. No other requirements or contingencies were stated in the cover letter.

The body of the Agreement set forth certain stipulations regarding ESA's entitlement to JDCs. The Agreement specifically defined what constituted the "Minimum Job Requirement" and permitted ESA to fall below the minimum requirement by 15% or exceed it by 50% and still remain eligible to claim JDCs. ESA also agreed that prior to making a claim for JDCs, it would notify Council when it met the minimum job requirement and the minimum capital investment and would provide all documentation Council required to verify compliance. Within thirty days of Council's satisfaction that the requirements were met, Council was required under the Agreement to certify to the Department that ESA was eligible to begin claiming JDCs.

The Agreement also included four exhibits. Exhibit A, entitled "Project Details," was referred to numerous times in the Agreement and reiterated the cover letter's requirement that ESA create a minimum of two hundred fifteen new jobs at its headquarters and invest a minimum of $14.49 million in the project. Exhibit B, entitled "Approved Employment Positions," listed three job titles—officers, managers, and staff—with each title employing ten, forty, and one hundred sixty-five individuals, respectively. Within each job title, Exhibit B set forth the wage bracket for that position with officers

earning $220,000 per year, management earning $73,000 per year, and staff earning $30,000[5] per year. Exhibit B also delineated the estimated job development credit percentages created by these positions. Exhibit C was a blank copy of the Employer Quarterly Report, which ESA had to file with Council to claim JDCs. Exhibit D, entitled "Special Provisions and Amendments," listed several amendments to the Agreement, but it contained no reference to a minimum wage contingency.

The Agreement expressly stated that it, along with its attached exhibits, constituted the entire agreement as to matters contained in the Agreement and superseded all prior agreements and understandings, written or oral, between the parties. Nowhere in the Agreement or in the four attached exhibits did the Council or ESA expressly define a minimum wage contingency.

Soon after the parties executed the Agreement, ESA submitted documentation to Council to prove it had met the minimum job requirement and minimum capital investment under the Agreement.[6] On September 30, 2003, Council responded and informed ESA it had reviewed ESA's documentation and approved ESA's request to claim JDCs. Further, Council stated it would begin calculating JDCs, effective October 1, 2003, and it would notify the Department of the certification.

Council approved ESA's first two claims for refunds.[7] However, when ESA submitted a refund claim for the second quarter of 2004 for $933,962 based upon the payment of $27,110,506 in wages to one hundred ninety eligible employees, the Department did not issue a refund.[8] Council then re-

---

**5.** Or $15.00 per hour based on a 2,000–hour work year, exclusive of benefits.

**6.** At the time ESA submitted its documentation, it had created two hundred thirty new jobs and had made a capital investment of $14,506,927.

**7.** ESA requested a refund in the fourth quarter of 2003 for $136,706 and a refund in the first quarter of 2004 for $80,623, both which were refunded in their entirety.

**8.** The large increase in employee compensation was due to the exercise of employee stock options for approximately sixteen executives.

viewed ESA's quarterly report and determined ESA had claimed JDCs for some jobs that paid less than the Spartanburg per capita hourly wage of $11.58 per hour.

Thereafter, Jackie Calvi, the program manager for Council's Grants Management Team, spoke with representatives of ESA and requested ESA amend its returns to delete any JDC claims for jobs that ESA had paid hourly wages less than $11.58. However, Calvi told ESA that all the new jobs it had created, including those paying $11.58 or less, could be counted toward the two hundred fifteen minimum job requirement required by the Agreement. Calvi relayed this information to the Department. ESA amended its returns, deleting any claims for new jobs that paid less than $11.58 per hour. The amendments resulted in excess refunds owed to the State in the amounts of $2,833 (fourth quarter of 2003) and $3,397 (first quarter of 2004).

After ESA filed its amended returns, the Department notified ESA it intended to conduct a field audit of ESA.[9] In late June 2005, Edward Barwick conducted the audit at ESA's headquarters in Spartanburg and issued a report on September 14, 2005. In his report, Barwick found the following: (1) ESA's amendments to its quarterly returns resulted in taxes owing to the State in the amount of $2,833 for the fourth quarter of 2003 and $3,397 for the first quarter of 2004; (2) all JDC claims should be denied because ESA failed to create the two hundred fifteen required jobs pursuant to the Agreement; and (3) ESA was not entitled to claim JDCs under the Agreement because it ceased to exist as a taxpayer during the claims period.

ESA timely filed a protest of the findings and proposed assessment contained in the Department's report. In its final agency determination, the Department affirmed the field auditor's findings and denied ESA's claims. ESA appealed to the ALC. On October 6 and 7, 2008, the ALC conducted a hearing and subsequently reversed the Department's denial of ESA's claims on the grounds that ESA had fully complied

---

9. A field audit is permissible pursuant to section 12–10–80(A)(9) of the South Carolina Code (Supp.2009), which states, "The department shall audit each qualifying business with claims in excess of ten thousand dollars in a calendar year at least once every three years to verify proper sources and uses of the funds."

with the terms of the Agreement. The ALC denied the Department's motion to reconsider, and this appeal followed.

## ISSUES ON APPEAL

The Department raises three issues on appeal:

(1) Did the ALC err in finding ESA complied with the terms of the Agreement because the ALC failed to properly construe Exhibit B?

(2) Are the ALC's findings of fact supported by substantial evidence?

(3) Did the ALC err in failing to defer to the Department's longstanding administrative practices?

## STANDARD OF REVIEW

This court's scope of review is set forth in section 1–23–610(B) of the South Carolina Code (Supp.2009). That section provides:

> The review of the administrative law judge's order must be confined to the record. The court may not substitute its judgment for the judgment of the administrative law judge as to the weight of the evidence on questions of fact. The court of appeals may affirm the decision or remand the case for further proceedings; or it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:
>
> (a) in violation of constitutional or statutory provisions;
>
> (b) in excess of the statutory authority of the agency;
>
> (c) made upon unlawful procedure;
>
> (d) affected by other error of law;
>
> (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

## LAW/ANALYSIS

### I. Terms of the Agreement

The Department first contends the ALC erred in concluding ESA abided by the terms of the Agreement when a plain

reading of the Agreement demonstrates ESA was required to create two hundred fifteen jobs paying at least $30,000 per year. We disagree.

When a contract or agreement is clear and capable of legal construction, the court's only function is to interpret its lawful meaning and the intent of the parties as found within the agreement. *Smith–Cooper v. Cooper,* 344 S.C. 289, 295, 543 S.E.2d 271, 274 (Ct.App.2001). However, when an agreement is ambiguous, the court should determine the parties' intent. *Ellie, Inc. v. Miccichi,* 358 S.C. 78, 94, 594 S.E.2d 485, 493 (Ct.App.2004). A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear. *Jordan v. Sec. Group, Inc.,* 311 S.C. 227, 230, 428 S.E.2d 705, 707 (1993). "Whether a contract is ambiguous is to be determined from the entire contract and not from isolated portions of the contract." *Farr v. Duke Power Co.,* 265 S.C. 356, 362, 218 S.E.2d 431, 433 (1975).

It is a question of law for the court whether the language of a contract is ambiguous. *Hawkins v. Greenwood Dev. Corp.,* 328 S.C. 585, 592, 493 S.E.2d 875, 878 (Ct.App. 1997). Once the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties. *Id.* at 592, 493 S.E.2d at 878–79. The determination of the parties' intent is then a question of fact. *Id.* at 592, 493 S.E.2d at 879. On the other hand, the construction of a clear and unambiguous contract is a question of law for the court. *Gardner v. Mozingo,* 293 S.C. 23, 25, 358 S.E.2d 390, 392 (1987).

The crux of the Department's argument is the Agreement expressly included a wage contingency and because ESA failed to comply with this contingency, the Department properly denied ESA's claim for JDCs. Specifically, the Department highlights Exhibit B in the Agreement, entitled "Approved Employment Positions," which lists three job categories, each having their own wage bracket.[10] The Depart-

---

10.

| Job Title | No. of Positions | Wage Bracket | Job Dev. Credit % |
| --- | --- | --- | --- |

ment contends the $30,000 wage bracket in Exhibit B proves ESA was required to create two hundred fifteen positions paying at least $15 per hour to be eligible to claim JDCs.

Despite the Department's argument, we find the plain language of the Agreement is silent regarding an established wage contingency. The parties agreed upon two material terms in their Agreement: a minimum capital investment of $14.49 million and the creation of at least two hundred fifteen jobs. This conclusion is supported by the plain language of the Agreement and its respective exhibits.

While the Department urges this court to construe Exhibit B as mandating a minimum wage contingency of $15 per hour, we find the Department's construction of Exhibit B would require us to read a term into the contract that does not exist. Exhibit B fails to state that ESA must create the exact number of "Approved Employment Positions" at the stated wage brackets to fulfill ESA's minimum job requirement.[11] Moreover, the definition of "Minimum Job Requirement" in the main body of the Agreement does not reference Exhibit B and does not include any mention of a wage contingency as a prerequisite to fulfilling the minimum job requirement. If the parties intended to incorporate a minimum wage contingency as a material term in the Agreement, we find this contingency would have been clearly set forth and defined as such in Exhibit B or within the main body of the Agreement.

A reading of other sections in the Agreement leads us to this same conclusion. *See S. Atl. Fin. Servs. Inc. v. Middleton,* 356 S.C. 444, 447, 590 S.E.2d 27, 29 (2003) (finding a contract should be read as a whole document so that "one may

| Officers | 10 | $220,000/year | 5% |
| Management | 40 | $ 73,000/year | 5% |
| Staff | 165 | $ 30,000/year | 4% |

11. We recognize that the two hundred fifteen approved employment positions from Exhibit B correlate to the two hundred fifteen jobs that must be created as part of the minimum job requirement. However, we fail to see how the $15 per hour wage bracket in Exhibit B is expressly incorporated into the minimum job requirement based on the contract's stated terms.

not, by pointing out a single sentence or clause, create an ambiguity"). Paragraph 3.4 of the Agreement states ESA must "maintain the Project substantially as proposed in the [initial] [a]pplication and as outlined in Exhibit A. . . ." Exhibit A does not mention a wage contingency, but it does reference the minimum job requirement and minimum capital investment. Additionally, the initial application, which is also referenced in Paragraph 3.4 of the Agreement, contains a Section K entitled, *"Projected* New Jobs and Payroll." (emphasis added). Section K from the initial application sets forth the same job categories as Exhibit B in the Agreement and instructs ESA to complete the section by listing the *"average* wage per hour and *estimated* annual payroll for new jobs." (emphasis added). While describing the wages and payroll as "average" and "estimated," Section K, in no uncertain language, instructs ESA that the total number of jobs listed in that section should reflect the minimum job requirement.

Accordingly, we hold the ALC properly determined the Agreement's plain language did not impose a wage contingency on ESA. *See Silver v. Aabstract Pools & Spas, Inc.,* 376 S.C. 585, 591, 658 S.E.2d 539, 542 (Ct.App.2008) ("In construing and determining the effect of a written contract, the intention of the parties and the meaning are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument, and when such contract is clear and unequivocal, its meaning must be determined by its contents alone; and a meaning cannot be given it other than that expressed.") (internal citation and internal quotation marks omitted).[12]

ESA concedes in its brief that its interactions with Council after entering into the Agreement modified the contract between the parties. ESA claims that while the Agreement did not state a wage contingency, ESA agreed after it submitted its claims for JDCs to impose an $11.58 wage contingency. This concession was based on Council's assur-

---

12. In light of our determination that the contract is unambiguous, we do not address the Department's alternative argument that the ALC failed to properly apply the parol evidence rule. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when a decision on a prior issue is dispositive).

ance that although ESA's jobs paying less than $11.58 would not be included when calculating its JDCs, those jobs would still count towards the minimum job requirement. We agree and find Council and ESA's decision to amend the Agreement to include a wage contingency was a valid modification of the contract.

Written contracts may be orally modified by the parties, even if the writing itself prohibits oral modification. *S.C. Nat'l Bank v. Silks,* 295 S.C. 107, 109–10, 367 S.E.2d 421, 422 (Ct.App.1988). Any modification of a written contract must satisfy all fundamental elements of a valid contract in order for it to be enforceable, including a meeting of the minds between the parties with regard to all essential terms of the agreement. *Player v. Chandler,* 299 S.C. 101, 104–05, 382 S.E.2d 891, 893 (1989). Thus, "[w]hile a written contract can be orally modified, there must be a meeting of the minds as to the modification." *First Union Mortgage Corp. v. Thomas,* 317 S.C. 63, 70, 451 S.E.2d 907, 912 (Ct.App.1994).

Here, ESA and Council,[13] as parties to the Agreement, mutually agreed to modify the Agreement to include an $11.58 wage contingency with the express understanding this amendment would not affect ESA's ability to meet the minimum job requirement. Both ESA and Council testified before the ALC they were in agreement on this modification and its effect on ESA's ability to claim JDCs for those jobs paying less than $11.58. This course of conduct between ESA and Council demonstrates they had a "meeting of the minds" as to the modified terms of the Agreement.

To reiterate, we hold the plain language of the Agreement, including Exhibit B, did not contain a wage contingency. Despite the lack of a stated wage contingency, we find the parties mutually agreed to orally modify the Agreement to include the $11.58 wage contingency with the understanding this contingency would have no effect on ESA's ability to satisfy its minimum job requirement. Accordingly, we hold

---

**13.** As program manager, Calvi was authorized by Council and the program guidelines to interact with ESA on matters pertaining to the Agreement. Because the Department failed to present any evidence she was acting outside the course of her employment or the scope of her authority in dealing with ESA, we find Calvi had the authority to amend the terms of the Agreement.

the ALC properly construed Exhibit B in concluding ESA complied with the terms of the Agreement.

## II. ALC's Findings of Fact

The Department next argues the ALC erred as a matter of law because its findings of fact were not based on the plain language of the Agreement, which prevented its decision from being based on substantial evidence. We disagree.

In an appeal from the final decision of an administrative agency, the standard of appellate review is whether the ALC's findings are supported by substantial evidence. S.C.Code Ann. § 1–23–610(B) (Supp.2009). Although this court shall not substitute its judgment for that of the ALC as to findings of fact, we may reverse or modify decisions that are controlled by error of law or are clearly erroneous in view of the substantial evidence on the record as a whole. *Id.* In determining whether the ALC's decision is supported by substantial evidence, this court need only find, considering the record as a whole, evidence from which reasonable minds could reach the same conclusion that the ALC reached. *Du-Rant v. S.C. Dep't of Health & Envtl. Control*, 361 S.C. 416, 420, 604 S.E.2d 704, 706 (Ct.App.2004).

The Department takes issue with several findings of fact in the ALC's order. However, the Department failed to raise these discrepancies in its motion to alter or amend pursuant to Rule 59(e), SCRCP. Because the ALC was never allowed to clarify any discrepancies in its order, these issues are not properly before this court on appeal. *See Home Med. Sys., Inc. v. S.C. Dep't of Revenue*, 382 S.C. 556, 563, 677 S.E.2d 582, 586 (2009) (permitting Rule 59(e), SCRCP, motions in ALC proceedings); *Revis v. Barrett*, 321 S.C. 206, 210, 467 S.E.2d 460, 463 (Ct.App.1996) (holding issue was not preserved on appeal when appellants never filed a motion to alter or amend the judgment to clarify the order pursuant to Rule 59, SCRCP, nor sought clarification pursuant to Rule 60(a), SCRCP); *Nelums v. Cousins*, 304 S.C. 306, 307–08, 403 S.E.2d 681, 681–82 (Ct.App.1991) (finding trial court's alleged failure to clarify discrepancies in written order was not preserved when party made no motion to amend the judgment).

Even if these issues were preserved for our review, any inaccuracies in the ALC's findings of fact were not material

and thus did not amount to prejudicial error in view of the substantial evidence on the whole record. *See McCall v. Finley,* 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct.App.1987) ("[W]hatever doesn't make any difference, doesn't matter.").

### III. Deference to the Department's Administrative Practices

 Last, the Department contends the ALC erred in failing to defer to the Department's longstanding administrative practice of auditing qualifying businesses under the Act. We disagree.

To resolve this issue, it is instructive to identify the role of Council, the Department, and a qualifying business under the Act. Pursuant to the Act, "the terms and provisions of each revitalization agreement must be determined by negotiations *between [C]ouncil and the qualifying business.*" § 12–10–60(A) (emphasis added). Furthermore, Council may establish criteria for the determination and selection of qualifying businesses and the approval of Agreements. S.C.Code Ann. § 12–10–100(A) (2000). "The decision to enter into a revitalization agreement with a qualifying business is *solely within the discretion of [C]ouncil* based on the appropriateness of the negotiated incentives to the project and the determination that approval of the project is in the best interests of the State." § 12–10–60(A) (emphasis added).

Once a qualifying business has certified to Council the business has met the minimum job requirement and minimum capital investment provided for in the revitalization agreement, the business may claim job development credits. § 12–10–80(A). If a qualifying business claims greater than ten thousand dollars in a calendar year, it must furnish to Council and to the Department a report that itemizes the sources and uses of the funds. § 12–10–80(A)(9). The Department shall audit each qualifying business with claims greater than ten thousand dollars in a calendar year at least once every three years to verify proper sources and uses of the funds. *Id.*

Moreover, in the event a qualifying business fails to achieve the level of capital investment or employment set forth in the revitalization agreement, Council may terminate the revitalization agreement and reduce or suspend all or any part of the incentives until the time the anticipated capital investment and

employment levels are met. S.C.Code Ann. § 12–10–90 (2000).

While the Department argues the ALC erred in failing to give it deference in its interpretation and administration of the Act,[14] this issue was not before the ALC. Rather, the ALC was faced with determining whether Council and ESA had expressly agreed to a wage contingency as part of fulfilling the minimum job requirement in the Agreement. The Legislature charged Council with the task of negotiating the terms of the Agreement and approving ESA's project if it was in the best interests of the State. *See* § 12–10–60. Only after Council had made that decision and executed the Agreement could the Department exercise its authority to audit ESA and accordingly adjust ESA's entitlement to JDCs. As set forth in section 12–10–80(A)(9), the Department's duty was to ensure ESA was properly using the JDCs by "verify[ing] proper sources and uses of the funds," and the Department never asserted ESA was not properly using the JDCs.

This court is aware the Department has the statutory authority to audit qualifying businesses pursuant to the Act and make appropriate adjustments when a qualifying business is not complying with the terms of its revitalization agreement as agreed upon by Council and the business. However, the Department's authority does not extend to negotiating or interpreting the terms of a revitalization agreement because the Act clearly assigns Council with this responsibility. *See* §§ 12–10–60(A), –100(A). Accordingly, the ALC was not required to defer to the Department's interpretation of the Agreement.

## CONCLUSION

Based on the foregoing, the ALC's order is

**AFFIRMED.**

PIEPER and KONDUROS, JJ., concur.

---

**14.** *See Media Gen. Commc'ns, Inc. v. S.C. Dep't of Revenue,* 388 S.C. 138, 149, 694 S.E.2d 525, 530–31 (2010) ("An agency's long-standing interpretation of a statute is usually entitled to be given deference and should not be overruled by a reviewing court in the absence of cogent reasons, but the interpretation will not be sustained if it contradicts a statute's plain language.").