730 S.E.2d 340

**D.R. HORTON, INC., Plaintiff,**

v.

**WESCOTT LAND COMPANY, LLC, Defendant,**

Thomas R. Hawkins and Wescott Land
Company, LLC, Appellants,

v.

**D.R. Horton, Inc., Respondent.**

No. 4998.

Court of Appeals of South Carolina.

Heard Dec. 8, 2011.

Decided July 11, 2012.

Rehearing Denied Aug. 9, 2012.

530

532

M. Dawes Cooke, Jr., and K. Michael Barfield, of Charleston, for Appellants.

Charles E. Carpenter, Jr., and Carmen Vaughn Ganjehsani, of Columbia, and Neil S. Haldrup, of Charleston, for Respondent.

HUFF, J.

D.R. Horton, Inc. (Horton) brought this action against Wescott Land Company, LLC (Wescott) for breach of contract. Wescott counterclaimed against Horton asserting claims of breach of contract, unfair trade practices, abuse of process, malicious prosecution, breach of contract accompanied by a fraudulent act, tortious interference with prospective economic advantage, and slander of title. Wescott's primary owner, Thomas R. Hawkins (Hawkins), was added as a counterclaimant, asserting the same claims against Horton. With the exception of the claim for breach of contract, the trial court granted Horton summary judgment on all of Wescott's counterclaims, and granted Horton summary judgment on all of Hawkins' counterclaims, including that of breach of contract. On appeal, Wescott and Hawkins (collectively hereinafter referred to as Appellants) assert error in the grant of

summary judgment in favor of Horton on the claims for slander of title, unfair trade practices, abuse of process, malicious prosecution, breach of contract accompanied by a fraudulent act, and tortious interference with prospective contractual relations. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

This appeal arises out of a contract for the conveyance of real property. In the early 1980's, Hawkins purchased approximately 400 acres of realty in Dorchester County. Hawkins sold around twenty-six acres of the property to another individual, and thereafter entered into a series of contracts with Horton for the sale of most, if not all, of the remaining acres. Horton purchased all but the last forty-plus acres in "individual chunks" from Hawkins. Thereafter, Hawkins, along with Tim Fraylick and Cliff Rickard, formed Wescott to develop and sell this remaining acreage to Horton.

In November 2004, Horton and Wescott entered into a contract whereby Horton agreed to buy, and Wescott agreed to sell, the property, consisting of 83 single family lots and 110 townhouse lots. The purchase and sale of the property was to be accomplished pursuant to a "Takedown Schedule," wherein set numbers of lots would be purchased over a period of sixteen quarters, with the single family lots being purchased quarter one through eight, and the townhouse lots to be purchased from quarter seven through sixteen.[1] Under the agreement, Wescott was required to meet certain conditions precedent pertaining to development of the lots and to provide documentation and certification of these conditions precedent prior to closing on the lots. The contract further provided that Horton was not obligated to purchase any lots which had not achieved "Substantial Completion," and stated " 'Substantial Completion' shall be achieved upon the date [Horton] receives [Wescott's] notice [regarding the meeting of the conditions precedent] accompanied by evidence satisfactory to [Horton], in [Horton's] reasonable discretion that said requirements have been met." Additionally, the contract stated that

---

1. The contract also recognized that lots could be purchased in excess of the required number per the schedule, but those lots purchased in excess would be credited in successive time frames.

if "Substantial Completion" had not been achieved by six months past the estimated date in the "Takedown Schedule" with regard to any lot to be purchased, Horton had the right, in its sole discretion, to either terminate the contract or extend the date for achievement of "Substantial Completion." Horton could also, in its sole discretion, elect to purchase lots prior to the achievement of "Substantial Completion," but Wescott would still be obligated to achieve "Substantial Completion" and Horton's election to purchase prior to "Substantial Completion" did not constitute a waiver of that obligation.

Subsequently, in July 2005, Wescott and Horton executed an amendment to the November 2004 contract, further specifying the duties and responsibilities of the parties to the development of the property and the time period for the purchase and sale of the property. Pursuant to the amendment, a new takedown schedule provided for the sale of the lots as follows:

a. Phase 3A (45 lots) on or before the later of July 1, 2005 or upon final plat approval and recordation. 45 lots @ $32,000/lot = $1,440,000.00

b. Phase 3D (38 lots) on or before the later of October 1, 2005 or upon final plat approval and recordation. 38 lots @ $32,000/lot = $1,216,000.00

c. Phase 3E–1 (37 lots) on or before the later of January 1, 2006 or upon final plat approval and recordation. 37 lots @ $25,500/lot = $943,500.00

d. Phase 3E–2 (37 lots) on or before the later of April 1, 2006 or upon final plat approval and recordation. 23 lots @ $25,500/lot = $586,500.00 and 14 lots @ $24,500/lot = $343,000.00

e. Phase 3E–3 (36 lots) on or before the later of July 1, 2006 or upon final plat approval and recordation. 36 lots @ $24,500/lot = $882,000.00

The amendment further added a stipulation that Wescott agreed to provide the conditions precedent documents and certifications set forth in the parties' contract twenty days prior to the closing date, in order to give Horton sufficient time to verify the documentation, inspect the property, and conduct final examinations to prepare for closing.

Horton closed on the lots in Phase 3A and Phase 3D, which apparently encompassed the 83 single family lots, and those matters are not in issue. However, a dispute arose in regard to the 110 townhouse lots in Phase 3E–1, 3E–2 and 3E–3. On July 19, 2006, Wescott sent Horton a letter in regard to Phase 3E indicating the conditions precedent required by the contract had been completed so that the twenty day period under the contract had begun running, and requesting to schedule a closing for the entire phase as soon as possible. On August 2, 2006, Wescott's attorney, Steven Smith, sent Horton a letter stating the conditions precedent had been satisfied and proof was provided to Horton on July 19, 2006, and therefore requested that closing on the properties take place no later than August 9, 2006. The letter further warned that failure to close by that date would constitute a default under the contract and amendment. On August 10, 2006, Smith again wrote Horton on behalf of Wescott stating that the conditions precedent documents and certification were delivered to Horton on July 19, 2006, a notice of completion was hand delivered to Horton on August 2, 2006 stating all lots must be closed no later than August 9, 2006, and notifying Horton it was in default for failure to close pursuant to the terms of the contract and amendment.

Horton responded to this letter on August 11, 2006 maintaining the conditions precedent to closing were not satisfied as to the townhouse lots until August 9, 2006, that the last of the documentation and certification for those lots was not received until August 10, 2006, and therefore, given the twenty days Horton was allowed under the contract, Horton could not be in default "until August 31, 2006 at the earliest." Horton further asserted the contract, as amended, contemplated the purchase and sale of the townhouse lots in three, separate, quarterly takedowns. Horton therefore indicated it would close on thirty-seven townhouse lots on August 31, 2006, would purchase a like number of them on November 30, 2006, and would close on the remaining lots on February 28, 2007. Horton proposed the parties execute a second amended contract, which would establish the new takedown schedule.

On August 18, 2006, Horton sent Smith a draft of the proposed "Second Amendment," setting forth a new schedule with Phase 3E–1 to close on or before September 5, 2006, 3E–

2 to close on or before December 5.2006, and 3E–3 to close on or before March 6, 2007. On September 13, 2006, Mitchell Flannery, from Horton, sent Tim Fraylick, with Wescott, an email attaching the proposed "Second Amendment," and indicating it had "36 units funded for takedown 1" and agreeing to "take 40 units down the 2nd phase and 36 the last." Horton also discussed the possibility of shrinking the takedown to "2 months apart rather than 3 months apart with the first closing immediately." On September 18, 2006, Flannery sent Fraylick another email, stating the parties needed to close on the funded units in the next few weeks, or he would have to "send the money back to corporate." Flannery indicated "[t]o give a little," he proposed they "shrink the takedown over 2 months rather than 3," and stated, "If you all don't agree to this the property could be tied up for a lot longer than this so I hope you will consider my proposal." Another proposed "Second Amendment" was attached to the email, this one setting forth closing dates for the three phases of October 5, 2006, December 5, 2006, and February 6, 2007.

On October 16, 2006, Horton's attorney, Michael Shetterly, wrote Wescott's attorney, Smith, referencing their conversation of October 11, 2006, and stating Wescott had not complied with the conditions precedent requirements set forth in the parties' contract as amended. In particular, Shetterly indicated that subparts (i) and (j) of paragraph 15 had not been met inasmuch as there was no evidence under subpart (i) of erosion control in place, and Horton had not seen any "sign-off" from a governmental entity showing erosion control had been erected, and no street lights had been installed pursuant to subpart (j). Shetterly stated Horton offered to forgive the remaining conditions precedent and assume the conditions precedent as Horton's obligations in exchange for a reasonable takedown schedule in three phases, beginning in October and concluding in February.

On November 6, 2006, Wescott received an offer from a third party, KB Homes, to purchase the property in question, proposing KB Homes buy the lots for $30,000 a piece with closings to occur on a quarterly basis. On November 29, 2006, KB Homes made another offer, proposing a price of $30,000 for the first 37 lots, $32,500 for the second takedown of 37 lots, and $33,500 for the third takedown of 36 lots, with the lots to

be purchased over a six month period.[2]  Wescott declined the offers from KB Homes because of concern over the contract with Horton and the fear that it would confuse the matter.

On December 4, 2006, Horton filed a lis pendens on the property in Phase 3E, naming Wescott as the defendant; however, this lis pendens expired prior to Horton filing any action to perfect the lis pendens.  On December 21, 2006, Wescott conveyed the property in question to Hawkins.[3]

Negotiations continued between the parties.  On December 27, 2006, Flannery sent Fraylick an e-mail referencing a meeting between the parties on the 21st, and providing a list of matters Horton required Wescott to rectify onsite within a few weeks of closing, in exchange for which Horton agreed to pay $30,000 per unit and close as soon as possible.  Included within the list of requirements was "the pads to be shaped back into their original condition and make sure that the pads are 95% compacted at 2,000 psf," and that Wescott provide Horton with "compaction letters."  On January 12, 2007, Horton's attorney sent Wescott's attorney another proposed "Second Amendment" for Wescott's consideration.  This amendment contained many provisions the earlier proposed amendments had not, including the requirement mentioned in the December 27 e-mail that Wescott, within two weeks after closing, make each of the 110 lots graded flat and constructed at ninety-five percent compaction with compaction of 2000 psf.  Under this amendment, Horton agreed to waive any right to have a phased takedown, and agreed to purchase the property in its entirety on or before February 2, 2006.  On January 16, 2007, Wescott's attorney sent Horton's attorney an amended version of Horton's latest proposal.  Wescott's amendment made some changes to the purchase price and escrow amounts, and completely deleted Horton's proposal concerning grading and compaction.  On January 26, 2007, Horton's attorney sent Wescott's attorney yet another proposed amend-

---

2.  Both proposed purchase prices from KB Homes exceeded the amounts Horton was to pay for the lots under the amendment to the contract.

3.  There is no indication Hawkins or Wescott ever informed Horton of this transfer, and Horton continued negotiations with Wescott until it filed this action against Wescott in February 2007.

ment, adding back the provision regarding grading and compaction. Wescott's attorney responded to this e-mail on January 30, 2007, proclaiming, "This is not at all what we agreed to," and asking to be contacted. Horton's attorney replied, indicating he would call to discuss Wescott's complaints with the proposed amendment. On January 31, 2007, Horton's attorney sent Wescott's attorney an e-mail stating Horton was adamant that the compaction matter remain in the proposed amendment.

Wescott's attorney testified he thought the reason Wescott did not agree to Horton's latest amendment was because of the compaction issue, as Wescott believed "compaction [had] already been done." Wescott's attorney appeared for closing on February 2, 2007, but no representatives from Horton appeared. Wescott's attorney then contacted Horton's attorney, who informed Wescott they were not closing because they had not worked out all the details, and the compaction matter was still an issue. Wescott's attorney acknowledged that Horton's attorney made it clear in this conversation that, all along, Horton required new compaction testing to show the pads met the conditions precedent to the contract, and that this requirement was not being raised for the first time, but they had discussed it for thirty days.[4]

Following this latest breakdown in negotiations, on February 13, 2007, Horton filed another lis pendens on the property, again naming Wescott as the defendant. This time, Horton followed up with the filing of a breach of contract action against Wescott on February 26, 2007. Around March 5, 2007, KB Homes made another offer to purchase the 110 townhouse lots for an amount even greater than its two previous offers in November 2006. Hawkins testified that the filed lis pendens prevented him from accepting KB Homes'

---

4. In support of its contention that compaction requirements had not been met, Horton submitted an affidavit for the engineer on this project, who stated his company "did not do compaction tests on these lots," but based on his experience and knowledge deterioration of the soils involved could occur due to weather and length of time between the testing reported on May 1, 2006 and the July 19, 2006 date. He further opined that the "upper 1 foot of soils depicted in the evaluations and certifications would not be valid as of July 19, 2006," and the "upper 1 foot of soils would deteriorate and not be valid on July 1, 2006 nor any date thereafter" without additional work effort.

offer. Hawkins further stated that a similar situation occurred with an offer from Jessco Homes. This offer likewise included a higher purchase price for the lots.

In April 2009, Horton filed an amended complaint for breach of contract against Wescott, asserting the parties had established a course of performance whereby the property would be developed and conveyed in phases, but in contravention of the course of performance, Wescott developed all the remaining property and demanded simultaneous closing on the property. Horton further alleged that Wescott failed to convey the property within the time required by the contract. Additionally, Horton maintained that Wescott failed to fulfill certain conditions precedent in a timely manner. Horton therefore asserted Wescott breached the contract by demanding performance by Horton prior to the time Wescott met all conditions precedent and after the time allowed in the contract. On April 30, 2009, Wescott filed its answer, and counterclaimed for breach of contract, unfair trade practices, abuse of process, malicious prosecution, breach of contract accompanied by a fraudulent act, tortious interference with prospective economic advantage, and slander of title. The counterclaim further added Hawkins as a counterclaimant, "as an owner" of the property, asserting that Hawkins conveyed the property to Wescott in June 2005, but the land was to revert back to Hawkins, per the terms of the transfer, should the sale to Horton not occur.

In May 2009, Horton filed a motion for summary judgment on Appellants' counterclaims for slander of title, breach of contract, unfair trade practices, abuse of process, malicious prosecution, breach of contract accompanied by a fraudulent act, and tortious interference with prospective economic advantage. Following a hearing on the matter, the trial court granted summary judgment to Horton on Appellants' counterclaims for slander of title, unfair trade practices, abuse of process, malicious prosecution, breach of contract accompanied by a fraudulent act, and tortious interference with prospective contractual relations. Additionally, the trial court granted summary judgment to Horton on Hawkins' breach of contract counterclaim. This appeal follows.

## ISSUES

1. Whether the trial court erred in entering summary judgment as to Appellants' slander of title claim.

2. Whether the trial court erred in entering summary judgment as to Appellants' unfair trade practices claim.

3. Whether the trial court erred in entering summary judgment as to Appellants' abuse of process claim.

4. Whether the trial court erred in entering summary judgment as to Appellants' malicious prosecution claim.

5. Whether the trial court erred in entering summary judgment as to Appellants' breach of contract accompanied by fraudulent act claim.

6. Whether the trial court erred in entering summary judgment as to Appellants' tortious interference with prospective contractual relations claim.

## STANDARD OF REVIEW

"The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder." *Dawkins v. Fields,* 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003) (quoting *George v. Fabri,* 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001)). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. Appellate courts apply the same standard applied by the trial court pursuant to Rule 56(c), SCRCP when reviewing a grant of summary judgment. *Turner v. Milliman,* 392 S.C. 116, 121–22, 708 S.E.2d 766, 769 (2011). In determining whether any triable issues of fact exist, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *Id.* at 122, 708 S.E.2d at 769. When the burden of proof is by a preponderance of the evidence, a non-moving party need only present a scintilla of evidence to withstand a motion for summary judgment. *Hancock v. Mid–South Mgmt. Co.,* 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009). "A court considering summary judgment neither makes factual

determinations nor considers the merits of competing testimony; however, summary judgment is completely appropriate when a properly supported motion sets forth facts that remain undisputed or are contested in a deficient manner." *David v. McLeod Reg'l Med. Ctr.*, 367 S.C. 242, 250, 626 S.E.2d 1, 5 (2006). "Summary judgment should not be granted even when there is no dispute as to evidentiary facts if there is dispute as to the conclusion to be drawn from those facts." *Brockbank v. Best Capital Corp.*, 341 S.C. 372, 378, 534 S.E.2d 688, 692 (2000).

"Under Rule 56(c), the party seeking summary judgment has the initial responsibility of demonstrating the absence of a genuine issue of material fact." *Baughman v. Am. Tel. & Tel. Co.*, 306 S.C. 101, 115, 410 S.E.2d 537, 545 (1991). This initial responsibility may be discharged by pointing out to the trial court that there is an absence of evidence to support the nonmoving party's case, and it is not necessary for the moving party to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* Once the moving party carries its initial burden, the opposing party must do more than rest upon the mere allegations or denials of his pleadings, but must, by affidavit or otherwise, set forth specific facts to show that there is a genuine issue for trial. *Id.;* Rule 56(e), SCRCP.

## LAW/ANALYSIS

### I. Slander of Title

■ The trial court found Horton was entitled to summary judgment on appellants' slander of title claim noting that, instead of putting forth any facts to establish slander of title, appellants relied on the fact that Horton filed two lis pendens. The trial court determined the filing of these lis pendens, which related to the property dispute giving rise to this action, were absolutely privileged under South Carolina law, and therefore could not be a basis for establishing a claim for slander of title, citing *Pond Place Partners, Inc. v. Poole,* 351 S.C. 1, 567 S.E.2d 881 (Ct.App.2002) (cert. denied).

Appellants first contend the trial court erred as a matter of law in finding the filing of the lis pendens was absolutely privileged such that a claim for slander of title fails as a

matter of law. They argue the trial court gave "far too broad a reading" of the *Pond Place* decision, and that *Pond Place* only stands for the proposition that, assuming a lis pendens is properly filed in accordance with the statutory requirements by one who has a colorable claim to the property to which it attaches, and the filing party completes the statutory process by the timely filing of an associated complaint, then the filing of the lis pendens is privileged. Appellants assert *Pond Place* did not extend a blanket privilege that would encompass an improper lis pendens, and argue that strict compliance with the statutory provisions is required. Thus, Appellants maintain Horton's filing of the lis pendens, the first of which was not timely followed with a complaint, did not comply with the statutory scheme.

In *Pond Place*, this court addressed the issue of whether the filing of a lis pendens was entitled to absolute privilege. There, Poole, along with others who owned property in a development, filed a declaratory judgment action against Pond Place and others, challenging an amendment to restrictive covenants on the subject property. *Id.* at 7, 567 S.E.2d at 884. Poole also filed a lis pendens on the property in question. *Id.* By way of counterclaim, Pond Place filed a cause of action for slander of title against Poole. *Id.* The trial court granted Pond Place's motion for summary judgment on Poole's declaratory judgment action, finding modification to the restrictive covenants was valid. *Id.* Thereafter, Pond Place prosecuted its slander of title action. *Id.* At the close of Pond Place's case, Poole moved for a directed verdict on the slander of title claim arguing the lis pendens was authorized by law, was properly filed, and was absolutely privileged. *Id.* at 14, 567 S.E.2d at 887. The trial court denied the motion, finding a lis pendens is not absolutely privileged, but is only qualifiedly privileged. *Id.* The jury returned a verdict against Poole, and Poole appealed, asserting he was entitled to a directed verdict on the slander of title claim. *Id.* at 14, 567 S.E.2d at 888. This court reversed, finding the trial court should have granted Poole's motion for directed verdict on the slander of title claim because the filing of a lis pendens is absolutely privileged in South Carolina. *Id.* at 32, 567 S.E.2d at 897.

This court issued a lengthy opinion discussing the law regarding the filing of a lis pendens, the nature of a slander of

title action, and other jurisdictions' treatment of the filing of a lis pendens and whether such an act enjoys a qualified or an absolute privilege. *Id.* at 16–29, 567 S.E.2d at 889–896. As to the filing of a lis pendens, this court stated as follows:

The purpose of a notice of pendency of an action is to inform a purchaser or encumbrancer that a particular piece of real property is subject to litigation. A properly filed lis pendens binds subsequent purchasers or encumbrancers to all proceedings evolving from the litigation. Generally, the filing of a lis pendens places a cloud on title which prevents the owner from freely disposing of the property before the litigation is resolved.

*Id.* at 16–17, 567 S.E.2d at 889 (quotations and citations omitted). We further noted section 15–11–10 of our code allows for the filing of a lis pendens not more than twenty days before filing the complaint in an action affecting the title to real property. *Id.* at 17, 567 S.E.2d at 889; S.C.Code Ann. § 15–11–10 (2005). We therefore determined that an action " 'affecting the title to real property' clearly allow[ed] the filing of a lis pendens by an interested party in order to protect [the person's] ownership interest in the property subject to the litigation." *Id.*

In regard to slander of title, we observed that our courts have adopted the following six point test a plaintiff must establish to prove such an action: "(1) the publication (2) with malice (3) of a false statement (4) that is derogatory to plaintiff's title and (5) causes special damages (6) as a result of diminished value of the property in the eyes of third parties." *Id.* at 21–22, 567 S.E.2d at 892. We also noted that "[w]rongfully recording an unfounded claim against the property of another generally is actionable as slander of title." *Id.* at 22, 567 S.E.2d at 892 (quoting *Huff v. Jennings,* 319 S.C. 142, 149, 459 S.E.2d 886, 891 (Ct.App.1995)).

Finally, as to whether the filing of a lis pendens is privileged, this court noted that "[p]rivileged communications are either absolute or qualified," and that "South Carolina has long recognized that relevant pleadings, even if defamatory, are absolutely privileged." *Id.* at 22 and 23, 567 S.E.2d at 892 and 893. We further stated that the majority of cases from other jurisdictions that have dealt with the question have held

that the filing of a lis pendens enjoys the absolute privilege that is accorded to judicial proceedings. *Id.* at 25, 567 S.E.2d at 893. The rationale set forth by these other jurisdictions is as follows:

(1) With few exceptions, any publication made in a judicial proceeding enjoys absolute privilege from later charges of defamation.

(2) The sole purpose of recording a notice of lis pendens is to give to prospective buyers constructive notice of the pendency of the proceedings.

(3) The notice of lis pendens is purely incidental to the action wherein it is filed, and refers specifically to such action and has no existence apart from that action.

(4) The recording of a notice of lis pendens is in effect a republication of the proceedings in the action and therefore, it is accorded the same absolute privilege as any other publication incident to the action.

*Id.* at 25, 567 S.E.2d at 894. In particular, we note this court cited two cases from other jurisdictions that applied the absolute privilege and held (1) since the filing of a lis pendens is incident to the filing of the complaint, if the plaintiff had probable cause to bring the action, then neither of the actions could be considered slander of title and (2) because the recording of a lis pendens is specifically authorized by statute and has no existence separate and apart from the litigation of which it gives notice, the filing of a notice of lis pendens is a part of a judicial proceeding and thus cannot form the basis for an action for libel or slander. *Id.* at 25–26, 567 S.E.2d at 894 (citing *Brough v. Foley,* 572 A.2d 63 (R.I.1990) and *Kropp v. Prather,* 526 S.W.2d 283, 287 (Tex.Civ.App.1975)). In addressing the reasons behind finding the filing of a lis pendens to be privileged, the court in *Pond Place* emphasized another jurisdiction's conclusion that the notice of a lis pendens is, in effect, a republication of some of the essential information contained in the complaint filed in the action. *Id.* at 27–28, 567 S.E.2d at 895 (citing *Wendy's of South Jersey, Inc. v. Blanchard Mgmt. Corp. of New Jersey,* 170 N.J.Super. 491, 406 A.2d 1337, 1339 (Ch.Div.1979)). Additionally, this court noted the Supreme Court of California held an absolute privilege attaches to a lis pendens "[i]f the publication has a reasonable relation to the action and is permitted by law." *Id.*

at 29, 567 S.E.2d at 896 (citing *Albertson v. Raboff,* 46 Cal.2d 375, 295 P.2d 405, 409 (Ca.1956)).

Based upon its thorough analysis, this court held a lis pendens filed in conjunction with an action involving the same real estate is merely another form of pleading. *Id.* at 30, 567 S.E.2d at 896. We also determined, however, that "[a lis pendens] is premised upon *and must be filed in time in conjunction with an underlying complaint involving an issue of property." Id.* (emphasis added). Ultimately, we concluded as follows:

> We find the filing of a lis pendens is **ABSOLUTELY** privileged in South Carolina. The filing of a lis pendens enjoys the absolute privilege accorded to judicial proceedings. Because the recording of a lis pendens is specifically authorized by statute and has no existence separate and apart from the litigation of which it gives notice, the filing of a lis pendens **CANNOT** form the basis of an action for slander of title.

*Id.* at 32, 567 S.E.2d at 897 (emphasis in original).

Appellants essentially argue that, because Horton did not follow through with the filing of a complaint within twenty days of the filing of the first lis pendens, the first lis pendens was not properly filed in accordance with the statutory requirements and, therefore, was not entitled to absolute privilege pursuant to *Pond Place,* as it was an improper lis pendens.[5] We disagree.

Although this court noted in *Pond Place* that a lis pendens is premised upon and "must be filed in time in conjunction with an underlying complaint" involving that property, we do not believe that Horton's failure to file a complaint within twenty days of the initial lis pendens necessarily invalidates the absolute privilege accorded the filing of a lis pendens as

---

5. Section 15–11–10, governing the time of filing notice of lis pendens, provides in part as follows:

> In an action affecting the title to real property the plaintiff (a) not more than twenty days before filing the complaint or at any time afterwards ..., may file with the clerk of each county in which the property is situated a notice of the pendency of the action, containing the names of the parties, the object of the action and the description of the property in that county affected thereby

S.C.Code Ann. § 15–11–10 (2005).

provided in *Pond Place*. Here, it is undisputed that Horton subsequently filed an identical lis pendens and followed that filing with the filing of a complaint involving the same real estate within a twenty day period pursuant to section 15–11–10. As noted, part of the rationale behind allowing absolute privilege to attach to the filing of lis pendens is that the notice of lis pendens is purely incidental to a filed action, and the recording of a notice of lis pendens is, in effect, "a republication of the proceedings in the action," and is therefore afforded the same privilege as any other publication incident to the action. It is simply a republication of some of the essential information contained in the complaint ultimately filed in the action. Although the initial lis pendens was allowed to expire before the twenty day period ran for filing a complaint on the matter, this simply rendered the initial lis pendens invalid. *See South Carolina Nat'l Bank v. Cook*, 291 S.C. 530, 532–33, 354 S.E.2d 562, 563 (1987) (finding a complaint filed more than twenty days after the filing of the lis pendens renders the lis pendens invalid). Because Horton thereafter filed a second lis pendens in compliance with the statute, we discern no reason why the identical lis pendens initially filed should not be afforded the same absolute privilege. As argued by Horton, and supported by the record before us, Horton allowed the first lis pendens to expire when the parties continued to negotiate, which thereby potentially obviated the need for the lis pendens. After negotiations between the parties finally broke down, Horton immediately filed a second lis pendens in conjunction with an action involving the same real property. It is also indisputable that the first lis pendens involved the same real property as that of the second lis pendens, and as that involved in the subsequent breach of contract action. To give the court's admonishment in *Pond Place* concerning strict compliance with the statutory provisions surrounding the filing of a lis pendens such a stringent interpretation as advanced by Appellants would require this court to ignore one of the primary tenets behind affording the absolute privilege, i.e. that the recording of the notice of lis pendens is in effect a republication of the proceedings in the action, providing the essential information contained in the complaint. Although the initial lis pendens was not perfected within twenty days, it still provided the essential information contained in the com-

plaint and amounted to a republication of the complaint. Accordingly, we hold that in a situation such as this, where a party allows a filed lis pendens to expire before the filing of an action, but subsequently files another lis pendens on the same property and thereafter timely files a complaint involving the same property, the filing of the lis pendens is afforded absolute privilege and may not be the basis for a slander of title action.[6]

## II. Unfair Trade Practices

■ Appellants next contend the trial court erred in granting Horton summary judgment as to their unfair trade practices claim. While they acknowledge a claim of breach of contract, standing alone, cannot state a claim under the unfair trade practices act, they contend the unfair trade practice here is not limited to a breach of the contract the parties entered, but that Horton "has engaged in a pattern and procedure of engaging in the same acts complained of herein." Specifically, they argue Horton is a national builder of residential developments that routinely enters into similar contracts throughout the country, and Horton "has used myriad reasons for delaying the closing without adequate presales, including changing the reasons for not closing." Appellants argue Horton uses various pretexts to string out the transactions until it is able to presell enough units to abide by the contract. They maintain this behavior is capable of repetition and that, carried out across the country, would amount to a clear violation of the unfair trade practices act. Appellants summarily argue the evidence is sufficient to form the basis for an unfair trade practices claim, and the court erred in holding they rested their claim solely on failure to fulfill contractual obligations. We find no error.

■ First, we find Appellants have abandoned this issue. In Appellants' brief, they fail to cite any law or authority in support of their argument, and make only conclusory arguments. While Appellants do cite to one federal district court

---

6. We intimate no opinion on whether the filing of a lis pendens that is allowed to expire and is not thereafter subsequently followed with the filing of a valid lis pendens and complaint on the same real property would also be entitled to absolute privilege.

case in their reply brief in regard to their unfair trade practices claim, their argument in this regard is also largely conclusory. *See First Sav. Bank v. McLean,* 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (noting an issue is deemed abandoned where appellant fails to provide arguments or supporting authority for his assertion); *Eaddy v. Smurfit–Stone Container Corp.,* 355 S.C. 154, 164, 584 S.E.2d 390, 396 (Ct.App.2003) ("[S]hort, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not preserved for our review.").

■ At any rate, we would affirm this issue on the basis that, assuming as Appellants contend that Horton used myriad reasons for delaying the closing, changed the reasons for not closing, and used various pretexts to string out the transactions, these actions, even if subsequently found to be in breach of the parties' contract, amount to nothing more than an intentional breach of contract. This finding is supported by Fraylick's deposition. When asked if there was anything, other than not purchasing the 110 town home lots, that Wescott was complaining Horton did not do, Fraylick responded, "No." Further, when specifically questioned regarding the allegation of unfair trade practices and what Horton did that was "unfair," Fraylick stated that Horton failed to close on the phases in a timely fashion and Horton "never performed on anything they said they were going to do." When asked what Horton did, other than not closing on time, Fraylick replied, "I guess it all relates back to not closing on time." Fraylick could not think of any other ways they were treated unfairly by Horton. When questioned about how Horton acted deceptively, Fraylick stated Horton "said they were going to close and they didn't close," and again agreed he could think of nothing else, but that it "all related to timeliness of closing or not closing." A mere breach of contract, without more, does not constitute a violation of the unfair trade practices act, even if done intentionally. *Key Co. v. Fameco Distribs., Inc.,* 292 S.C. 524, 526, 357 S.E.2d 476, 478 (Ct.App.1987). Otherwise, every intentional breach of a contract within a commercial setting would constitute an unfair trade practice and thereby subject the breaching party to treble damages. *Id.* at 527, 357 S.E.2d at 478. This evidence supports the trial court's determination that Appellants' claim rested solely on the assertion

that Horton failed to fulfill its contractual obligations, and that a mere breach of contract is insufficient to constitute a violation of the UTPA.

## III. Abuse of Process

Appellants contend the trial court erred in finding Horton was entitled to summary judgment as to their abuse of process claim based upon its finding Appellants failed to set forth a genuine issue of material fact as to ulterior motive. Citing *Broadmoor Apartments of Charleston v. Horwitz*, 306 S.C. 482, 413 S.E.2d 9 (1991), they argue our courts have found the filing of a lis pendens to prevent the sale of property to a third party can constitute ulterior motive. Appellants argue that despite their valid rescission of the contract, Horton filed a lis pendens against the property, and though Appellants "had every right to walk away from the parties' contract," Horton misused a lis pendens to tie up the property and attempt to browbeat Wescott into accepting Horton's new terms. In support of this argument, Appellants point to Flannery's September 18, 2006 e-mail to Fraylick, wherein Flannery states, "If you all don't agree to this the property could be tied up for a lot longer than this so I hope you will consider my proposal." They argue, pursuant to *Broadmoor*, a lis pendens may constitute an abuse of process when done without justification and for the purpose of preventing third parties from purchasing the subject property. Appellants contend Horton's lack of specific knowledge of KB Homes' offer does not excuse Horton's conduct.

■■■ We find the trial court properly granted summary judgment on this claim because Appellants failed to present evidence meeting the essential elements of an abuse of process claim. The two essential elements of an abuse of process claim are (1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the conduct of the proceeding. *Argoe v. Three Rivers Behavioral Ctr. & Psychiatric Solutions*, 388 S.C. 394, 403, 697 S.E.2d 551, 556 (2010). "The abuse of process tort provides a remedy for one damaged by another's perversion of a legal procedure for a purpose not intended by the procedure." *Id.*

"An ulterior purpose exists if the process is used to gain an objective not legitimate in the use of the process." *First Union Mortg. Corp. v. Thomas,* 317 S.C. 63, 74, 451 S.E.2d 907, 914 (Ct.App.1994). "[T]here is no liability when the process has been carried to its authorized conclusion," even if done with bad intentions. *Id.* at 74–75, 451 S.E.2d at 914. "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself." *Hainer v. Am. Med. Int'l, Inc.,* 328 S.C. 128, 136, 492 S.E.2d 103, 107 (1997). "Some definite act or threat not authorized by the process or aimed at an object not legitimate in the use of the process is required." *Id.* The essence of the tort of abuse of process centers on events occurring outside the process, and our courts have noted that "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or club." *Swicegood v. Lott,* 379 S.C. 346, 353, 665 S.E.2d 211, 214 (Ct.App.2008) (quoting *Huggins v. Winn–Dixie Greenville, Inc.,* 249 S.C. 206, 209, 153 S.E.2d 693, 694 (1967)). "There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." *Id.* (quoting *Huggins,* 249 S.C. at 209, 153 S.E.2d at 694).

Our courts have noted that an abuse of process action may lie if a party prosecutes an entire lawsuit for collateral purposes. *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union,* 351 S.C. 65, 73, 567 S.E.2d 251, 255 (Ct.App.2002). Nonetheless, "[a]n allegation of an ulterior purpose or 'bad motive,' standing alone, is insufficient to assert a claim for abuse of process." *Id.* at 74, 567 S.E.2d at 255. An ulterior purpose, to satisfy that element for abuse of process, exists if the process is used to gain an objective not legitimate in the use of the process. *Id.* at 71, 567 S.E.2d at 253. However, even assuming there is some evidence a party has an ulterior motive for bringing an action, that party is entitled to summary judgment in its favor on an abuse of process claim if there is no evidence the party engaged in a "willful act," an element essential to the abuse of process

cause of action which is characterized as a "definite act . . . not authorized by the process or aimed at an object not legitimate in the use of the process." *Southern Glass & Plastics Co. v. Duke*, 367 S.C. 421, 430–31, 626 S.E.2d 19, 24 (Ct.App.2005) (quoting *Hainer*, 328 S.C. at 136, 492 S.E.2d at 107).

In *Food Lion*, our court stated as follows:

The distinction between the two requirements is evident in the language of the Restatement of Torts: "One who uses a legal process, whether criminal or civil, against another *primarily* to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Restatement (Second) of Torts § 682 (1977) (emphasis added). As noted in the Restatement comment, "[t]he significance of ['primarily'] is that there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." Restatement (Second) of Torts § 682 cmt. b. at 475 (1977). Accordingly, liability exists not because a party merely seeks to gain a collateral advantage by using some legal process, but because the collateral objective was its sole or paramount reason for acting. *See id.* . . . It therefore follows that when a claim for abuse of process is predicated on an alleged act "aimed at an object not legitimate in the use of the process," the ulterior purpose allegation must be accompanied by an allegation that the process was misused by the undertaking of the alleged act, not for the purpose for which it was intended but for the primary purpose of achieving a collateral aim.

*Id.* at 75, 567 S.E.2d at 255–56 (some citations omitted) (emphasis in original).

■ Here, Appellants have asserted Horton filed the lis pendens to prevent the sale of property to a third party and misused the lis pendens to tie up the property and attempt to browbeat Wescott into accepting Horton's new terms to the contract. Even assuming for the sake of argument that Appellants' allegation might qualify as an "ulterior motive," we find such an allegation is insufficient to overcome Horton's summary judgment motion, as Appellants have presented no evidence of any willful acts "not authorized in the use of the

process." Clearly, Horton had the right to negotiate with Appellants when the parties came to a disagreement regarding their obligations under the contract. The fact that the September e-mail states that the property could be tied up for a longer period of time if the parties do not come to some resolution does not evince an act that is not authorized by the process. Horton merely recognized that Appellants desired to close on all of the property right away, and the parties' inability to agree on terms would prolong any closing. Accordingly, Appellants failed to submit even a scintilla of evidence that Horton engaged in a willful act in the use of the process not proper in the conduct of the proceeding, and the trial court properly granted Horton's motion for summary judgment on Appellants' abuse of process claim. *See also CEL Products, LLC v. Rozelle*, 357 S.C. 125, 129–30, 591 S.E.2d 643, 645 (Ct.App.2004) (holding former employer was entitled to summary judgment as to former employee's claim of abuse of process where former employee's response to the summary judgment motion merely relied on former employee's pleadings, and former employee did not prepare a summary judgment affidavit creating a genuine issue of material fact).[7]

---

7. We find the *Broadmoor* case, cited by Appellants, is distinguishable from the case at hand. In *Broadmoor*, our supreme court found sufficient evidence from which the jury could infer that defendant corporation and its president willfully abused the process by filing a lis pendens for the ulterior purpose of preventing a sale to third parties in hopes of obtaining financial backing to purchase the property at an advantageous price. *Broadmoor*, 306 S.C. at 487, 413 S.E.2d at 12. Notably, the court did not specifically delve into what constitutes the elements of "an ulterior purpose", and "a willful act in the use of the process not proper in the regular conduct of the proceedings." Rather, the court determined the trial court properly denied appellants' motion for directed verdict on Broadmoor's abuse of process claim where the facts showed as follows: appellant Schlopy, who initially contracted to purchase the property, "assigned" the contract to appellant Berkeley Square Realty, notwithstanding Broadmoor's rejection of the assignment, then advised appellant Horwitz, Berkley's President, that he thought filing a lis pendens was a good idea; and, during the pendency of the lawsuit Schlopy, who had the right to assign his interest without Broadmoor's consent only if a corporation known as Marc Equity was a partner of the assignee, filed an affidavit on Berkeley's behalf, erroneously listing Marc Equity in the assignment, and stating "the information was satisfactory and the parties would proceed to fulfill the terms of the contract," but there was nothing in the record to support the

Finally, we note the trial court properly determined, because Horton did not employ any legal procedure or process against Hawkins, Hawkins cannot maintain an action against Horton for abuse of process.

## IV. Malicious Prosecution

Appellants next contend the trial court erred in granting summary judgment on their malicious prosecution claim. They argue the trial court granted Horton summary judgment on this claim because the claim was not ripe, but the court's finding in this respect did not refer to the initial lis pendens that expired under its own terms, which was the civil proceeding that underpinned Appellants' malicious prosecution claim. They contend that *Pond Place* specifically recognizes that a proper action against a maliciously filed lis pendens includes a malicious prosecution action, and the fact that Appellants had yet to prevail against Horton in the present action had no bearing on the ripeness of its claim for malicious prosecution based on the first lis pendens.

We find this argument is abandoned on appeal. Appellants merely summarily argue that the trial court erred in finding their claim was not ripe, but fail to cite any law or authority in support of their argument that the fact they have yet to prevail has no bearing on the matter. Their reference to *Pond Place* addresses only whether a maliciously filed lis pendens will support a malicious prosecution cause of action, and does not address whether a party is required to prevail in a matter before bringing such an action. *See McLean,* 314 S.C. at 363, 444 S.E.2d at 514 (noting an issue is deemed abandoned where appellant fails to provide arguments or supporting authority for his assertion); *Eaddy,* 355 S.C. at 164, 584 S.E.2d at 396 (Ct.App.2003) ("[S]hort, conclusory

---

affidavit and, to the contrary, Broadmoor had explicitly rejected Schlopy's request that the required deposit be reduced from $50,000 to $25,000. *Id.* Thus, there was an abundance of evidence Schlopy and the others knew they had not complied with the contractual terms, but filed a lis pendens for an ulterior purpose, i.e. to tie up the property until it could obtain financial backing at a favorable price. Further, the court did not address the elements of an abuse of process claim in *Broadmoor,* and made no specific findings whatsoever applicable to the second necessary element, i.e. a willful act in the use of the process not proper in the conduct of the proceeding.

statements made without supporting authority are deemed abandoned on appeal and therefore not preserved for our review.").

### V. Breach of Contract Accompanied by Fraudulent Act

Appellants contend the trial court erred in granting summary judgment to Horton on their breach of contract accompanied by a fraudulent act claim. They contend they put forth sufficient facts to support recovery for this cause of action, ranging from Horton's shifting reasons for refusing to close on Phase 3E, reversing positions as to whether conditions precedent had been satisfied, its strained and self-serving construction of the parties' contract, and Horton's written threat to tie up the property if Horton did not get its way. They further argue, whether Appellants provided sufficient evidence they relied on misrepresentations by Horton is a genuine issue of fact to be determined by the trier of fact. Appellants also contend the filing of successive lis pendens for the purpose of preventing third parties from acquiring the property and forcing them to bend to Horton's will is, in itself, a fraudulent act accompanying Horton's breach. They maintain the lis pendens was designed for no other purpose than to cloud their title to the property and to interfere with their right to freely alienate the property, and that genuine issues of material fact exist as to whether Horton's intent was fraudulent. We disagree.

To establish a claim for breach of contract accompanied by a fraudulent act, a party must show: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. *Conner v. City of Forest Acres,* 348 S.C. 454, 465–66, 560 S.E.2d 606, 612 (2002). "Fraudulent act" is broadly defined as "any act characterized by dishonesty in fact or unfair dealing." *Id.* at 466, 560 S.E.2d at 612. " 'Fraud,' in this sense, 'assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or absence.' " *Id.* (quoting *Sullivan v. Calhoun,* 117 S.C. 137, 139, 108 S.E. 189, 189 (1921)). Breach

of contract accompanied by a fraudulent act requires proof of fraudulent intent relating to the breaching of the contract and not merely to its making, and such proof may or may not involve false representations. *Ball v. Canadian Am. Exp. Co.*, 314 S.C. 272, 276, 442 S.E.2d 620, 623 (Ct.App.1994). "Fraudulent intent is normally proved by circumstances surrounding the breach." *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 54, 336 S.E.2d 502, 503–04 (Ct.App.1985). "The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character." *Id.* at 54, 336 S.E.2d at 504.

Here, Appellants have failed to present any evidence Horton committed a fraudulent act accompanying its alleged breach of contract. Appellants maintain Horton's shifting reasons for refusing to close on Phase 3E, reversing positions as to whether conditions precedent had been satisfied, its strained and self-serving construction of the parties' contract, and Horton's written threat to tie up the property if Horton did not get its way support this cause of action. Even if we were to assume these qualify as evidence of Horton's fraudulent intent in breaching the contract, they are not evidence of an independent fraudulent act which accompanied the breach. *See Minter v. GOCT, Inc.*, 322 S.C. 525, 530, 473 S.E.2d 67, 70–71 (Ct.App.1996) (holding evidence corporation opened quick oil-change facility without offering real estate developer contractual right of first refusal despite being put on notice by developer that such conduct would be regarded as breach, while possibly evidence of corporation's fraudulent intent in breaching the contract, was not evidence of an independent fraudulent act which accompanied the breach). Further, Appellants submitted no evidence that Horton had any fraudulent intent in filing the lis pendens, nor any evidence the act of filing the lis pendens was dishonest or amounted to unfair dealing. Even when viewing the evidence in the light most favorable to Appellants, more is required than mere speculation to withstand Horton's motion for summary judgment on this claim. *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 471, 597 S.E.2d 881, 883 (Ct.App.2004). Accordingly, we find no error in the trial court's grant of summary judgment to Horton on this counterclaim.

Additionally, we again note the trial court properly determined, because Hawkins did not have a contract with Horton, Hawkins' claim for breach of contract accompanied by a fraudulent act must fail.

## VI. Interference with Prospective Contractual Relations

Lastly, Appellants contend the trial court erred in granting Horton summary judgment on their intentional interference with prospective contractual relations claim.[8] They contend the evidence presented established that they declined to ratify the numerous offers from others to purchase the property out of concern the lis pendens filed by Horton would prevent the deals from going forward, and if Horton acted in bad faith by filing the lis pendens to tie up the property, as evidenced by Flannery's threat to do so, it was with full knowledge such action would prevent Appellants from selling the property to third parties. Thus, Appellants assert genuine issues of material fact exist as to this claim.

While our courts previously refused to recognize a common law action for intentional interference with prospective contractual relations, in *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 302 S.C. 265, 395 S.E.2d 179 (1990), our supreme court abandoned our prior law and recognized such a cause of action in South Carolina. *Id.* at 266, 395 S.E.2d at 180. To establish a cause of action for intentional interference with prospective contractual relations, the plaintiff must prove: (1) that the defendant intentionally interfered with the plaintiff's potential contractual relations, (2) for an improper purpose or by improper methods, and (3) that the interference caused injury to the plaintiff. *Id.* While it is not necessary that the interfering party intend harm, it is necessary that he *intend to interfere* with a prospective contract. *Eldeco, Inc. v. Charleston Cnty. Sch. Dist.*, 372 S.C. 470, 481, 642 S.E.2d 726, 732 (2007).

---

8. Although the Appellants referred to this cause of action as tortious interference with prospective economic advantage in their counterclaim, the trial court and the parties acknowledge this action is recognized in South Carolina as intentional interference with prospective contractual relations.

■ We affirm this issue based on Appellants' inability to show Horton intentionally interfered with Appellants' prospective contractual relations. It is undisputed Appellants were unable to show Horton was ever aware of any offers, or even negotiations, between Appellants and third parties in regard to the sale of the property. Thus, Appellants cannot show the most basic element of the cause of action, i.e. that Horton intentionally interfered. Because there is no evidence Horton was aware of any prospective third party relations, there is no evidence Horton intentionally interfered with them.

## CONCLUSION

Based on the foregoing, we affirm the trial courts' granting of summary judgment to Horton on Appellants' counterclaims for slander of title, unfair trade practices, abuse of process, malicious prosecution, breach of contract accompanied by a fraudulent act, and tortious interference with prospective economic advantage.

**AFFIRMED.**

LOCKEMY, J., concurs.

PIEPER, J., concurring.

I agree that we should affirm the order of the trial court granting summary judgment, but I write separately as I do not believe the filing of the December 4, 2006 lis pendens is entitled to absolute privilege on Appellants' slander of title cause of action. Nonetheless, I would affirm because Appellants failed to set forth a genuine issue of material fact as to the elements essential to the slander of title cause of action.

The statute providing the procedure for filing a lis pendens states:

In an action affecting the title to real property the plaintiff (a) not more than twenty days before filing the complaint or at any time afterwards or (b) whenever a warrant of attachment under §§ 15–19–10 to 15–19–560 shall be issued or at any time afterwards or a defendant when he sets up an affirmative cause of action in his answer and demands substantive relief, at the time of filing his answer or at any time afterwards if such answer be intended to affect real

estate, may file with the clerk of each county in which the property is situated a notice of the pendency of the action, containing the names of the parties, the object of the action and the description of the property in that county affected thereby. If the action be for the foreclosure of a mortgage such notice must be filed twenty days before judgment and must contain the date of the mortgage, the parties thereto and the time and place of recording such mortgage.

S.C.Code Ann. § 15–11–10 (2005). A lis pendens "is premised upon and must be filed in time in conjunction with an underlying complaint involving an issue of property." *Pond Place Partners, Inc. v. Poole,* 351 S.C. 1, 30, 567 S.E.2d 881, 896 (Ct.App.2002). A complaint filed more than twenty days after the filing of the lis pendens renders the lis pendens invalid. *South Carolina Nat'l Bank v. Cook,* 291 S.C. 530, 532–33, 354 S.E.2d 562, 563 (1987). "Since the filing of a lis pendens is an extraordinary privilege granted by statute, strict compliance with the statutory provisions is required." *Pond Place,* 351 S.C. at 17, 567 S.E.2d at 889. "[T]he filing of a lis pendens is absolutely privileged in South Carolina." *Id.* at 32, 567 S.E.2d at 897.

Here, it is undisputed that Horton filed a lis pendens on December 4, 2006, and did not file a complaint within twenty days. Therefore, Horton did not meet the statutory requirements for filing a lis pendens. Because strict compliance with the statutory requirements for filing a lis pendens is required, the December 4, 2006 lis pendens is invalid, and thus, is not entitled to absolute privilege.

However, instead of putting forth facts to establish a genuine issue of material fact on Appellants' slander of title cause of action, Appellants relied solely on the fact that Horton filed two lis pendens. "[T]o maintain a claim for slander of title, the plaintiff must establish (1) the publication (2) with malice (3) of a false statement (4) that is derogatory to plaintiff's title and (5) causes special damages (6) as a result of diminished value of the property in the eyes of third parties." *Huff v. Jennings,* 319 S.C. 142, 149, 459 S.E.2d 886, 891 (Ct.App.1995) (citing *TXO Prod. Corp. v. Alliance Res. Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). "Actual malice can mean the defendant acted recklessly or wantonly, or with conscious disregard of

the plaintiff's rights." *Constant v. Spartanburg Steel Prods., Inc.,* 316 S.C. 86, 89, 447 S.E.2d 194, 196 (1994). "Special damages recoverable in a slander of title action are the pecuniary losses that result 'directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement, and the expense of measures reasonably necessary to counteract the publication, including litigation.'" *Huff,* 319 S.C. at 150–51, 459 S.E.2d at 892 (quoting 50 Am.Jur.2d Libel & Slander § 560).

Viewing the evidence in the light most favorable to Appellants, the pleadings, depositions, answers to interrogatories, and affidavits submitted to the court failed to set forth facts creating a genuine issue of material fact as to all elements of the slander of title cause of action. *See* Rule 56(c), SCRCP (stating summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). Specifically, Appellants failed to set forth a genuine issue of material fact on the elements of malice and special damages. *See Baughman v. Amer. Tel. & Tel. Co.,* 306 S.C. 101, 116, 410 S.E.2d 537, 545–46 (1991) ("The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."). Based on the foregoing, the trial court did not err in granting summary judgment on Appellants' slander of title cause of action.